*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re CARTER/NORTON, Minors.

UNPUBLISHED
November 12, 2019

No. 348595
Wayne Circuit Court
Family Division
LC No. 16-522747-NA

Before: M. J. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to the minor children, AC, JC, and RN, under MCL 712A.19b(3)(g) and (j).[1] Because we find no error requiring reversal, we affirm.

## I. BACKGROUND

Respondent's daughter, AC, has Down syndrome. She also suffers from, among other things, Tetralogy of Fallot, a common heart defect in children with this syndrome. In early 2016, when AC was six months old, she required open-heart surgery to correct the heart defect. Respondent, however, failed to follow through with the cardiologist to schedule medical appointments and the surgery. After AC eventually underwent heart surgery in the spring of 2016, respondent failed to visit AC regularly and, as a consequence, respondent was not present to learn about the care AC would require at discharge. During this time period, respondent was also struggling with her own mental health issues. Initially, Child Protective Services offered preventative services to help respondent understand AC's condition and her medical needs.

---

[1] The trial court also terminated the parental rights of the father of AC and JC, and the unidentified father of RN. Although respondent asserts that the trial court also terminated her parental rights under §§ 19b(3)(a)(*i*), (a)(*ii*), (c)(*i*), and (k)(*i*), it is apparent from the record that these additional grounds were intended to apply only to the children's fathers, who are not parties to this appeal. In its decision from the bench, the trial court made clear that it was terminating respondent's parental rights under only §§ 19b(3)(g) and (j).

-1-

After AC's medical providers and the Department of Health and Human Services ("DHHS") became more concerned with respondent's parenting ability, the DHHS filed a petition seeking temporary custody of the children.

In August 2016, respondent entered a plea admitting that she missed some of AC's essential cardiac appointments and missed all of the child's rehabilitation appointments. Respondent acknowledged that she was admitted to Detroit Receiving Hospital for depression in April 2016. Respondent also admitted that she smoked marijuana up to three times a day and that she did not have a medical-marijuana card. Finally, respondent admitted that she was homeless in May 2016, and that, at the time of her plea, she lacked suitable housing and was unable to provide proper care and custody for her children. The trial court accepted respondent's plea and found that statutory grounds existed for it to exercise jurisdiction over the children. Immediately thereafter, the case proceeded to disposition and the trial court ordered respondent to participate in a treatment plan designed to improve her parenting skills and to assist her in understanding her children's medical, educational, and emotional needs.

In the year that followed the adjudication, respondent's participation in services was inconsistent and she made little progress toward reaching the goals of her treatment plan. In August 2017, the DHHS filed a petition requesting termination of respondent's parental rights. After several months of hearings, the trial court denied this petition in April 2018, and instead ordered that respondent undergo a trauma assessment and participate in any treatment recommendations that flowed from that assessment.

During the review periods that followed the trial court's denial of the permanent custody petition, respondent achieved, at best, partial compliance with the treatment plan. More specifically, respondent did not fully participate in or benefit from the additional trauma therapy that the trial court ordered. Respondent also failed to attend AC's medical appointments, she did not consistently participate in her drug screens, and her attendance at parenting time was sporadic. Consequently, in August 2018, the children's guardian ad litem ("GAL") filed a supplemental petition requesting termination of respondent's parental rights. At the conclusion of the second termination hearing that followed, the trial court found that the statutory grounds for termination had been established by clear and convincing evidence and that termination of respondent's parental rights was in the children's best interests.

This appeal followed.

## II. ANALYSIS

Respondent first argues that the trial court erred when it found that petitioner had established the statutory grounds for termination by clear and convincing evidence. We conclude that the trial court properly found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(j).

### A. STATUTORY GROUNDS FOR TERMINATION

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re*

*Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(j). This statutory provision permits termination of parental rights under the following circumstances:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

After reviewing the record, we conclude that the trial court did not err when it terminated respondent's parental rights under MCL 712A.19b(3)(j).

The trial court took jurisdiction over the children primarily because of medical neglect, but respondent also admitted to drug use, mental-health issues, and a lack of suitable housing. The trial court ordered respondent to comply with a treatment plan that was designed to improve her parenting skills and remove the barriers to reunification. She was required to attend parenting time, obtain and maintain suitable housing and a legal source of income, participate in a psychological evaluation and individual counseling with a substance-abuse component, and submit to weekly random drug screens. The trial court also ordered respondent to attend her children's medical appointments, including AC's weekly occupational and physical therapy sessions.

Early on, this case was assigned to the "Baby Court," a docket designed to provide intensive services to at-risk families. Participation in this program meant that AC and respondent would also have the benefit of working with an infant-mental-health (IMH) specialist. In addition, judicial review would be held at more frequent intervals. Despite these efforts, after 2½ years of services, respondent failed to comply substantially with her treatment plan. To the extent that she participated in services, she clearly did not benefit from them.

Most apparent was respondent's failure throughout the entirety of the proceedings to attend to her children's medical and educational needs. AC required constant medical monitoring. She regularly participated in occupational and physical therapy, while also treating with multiple specialists, including a cardiologist, a gastroenterologist, a pulmonologist, as well as an ear, nose, and throat specialist. JC's circumstances were not as severe as AC's, but she too had special medical and educational needs. As a result of neglect by respondent, JC had significant dental issues. She also was academically behind and required the implementation of an individualized-educational plan. In light of her children's special needs, it was imperative that respondent attend appointments to learn about her children's conditions so that she could then be an effective advocate on their behalf. In an effort to assist respondent, appointments

were frequently made taking into account respondent's work schedule and giving respondent advance notice. Notwithstanding these efforts, respondent failed to attend her children's medical and educational appointments on a consistent basis.

At the time of the December 2018 termination hearing, respondent had missed 65 out of 70 medical appointments for AC. Rather than learn what would be required to parent her special-needs children, respondent appeared content to allow the foster parents to assume responsibility for all of her children's needs. As a result, there was clear and convincing evidence that if the children were returned to respondent's care, she would not be able to advocate on their behalf and thereby provide for their substantial needs.

Similarly, respondent did not consistently attend parenting time with her children. Between May 2016 and January 2018, respondent missed 71 of 140 parenting-time opportunities. After two years of services, respondent's attendance at parenting time never improved. During the three-month period before the December 2018 termination hearing, respondent still only attended half of the parenting-time visits she was offered. Similarly, respondent did not consistently attend the IMH sessions that were designed, in part, to assist in building an attachment between herself and the children. It was clear that respondent's failure to attend parenting time and participate in the IMH sessions impaired the parent-child relationship. The IMH therapist who worked with the family for more than two years testified that she did not see any progress within the relationships during this time. Respondent continued to have a very flat affect with AC. Respondent rarely exhibited any joy, eye contact, or engagement with AC. In response, AC exhibited "avoidant attachment." Of note, the therapist explained that AC's disability did not affect her ability to have attachments with caregivers. Indeed, AC did attach to other caregivers in her life, specifically her foster mother. The evidence clearly showed that respondent's failure to participate in the services offered directly impaired the relationships she had with her children.

Respondent also failed to address her own mental health issues. The IMH specialist opined that respondent's lack of progress might be attributable to her mental health issues. While respondent did attend individual therapy, it was clear that she was not candid with her therapist, as evidenced by the fact that the therapist believed that respondent was substance-free and was unaware that respondent continued to test positive for marijuana. Further, respondent refused to engage in the trauma-based therapy and she did not consistently take her prescribed medications. During treatment with both the IMH therapist and Dr. Vida Fiorentino, respondent consistently denied that she was depressed and averred that she had no trauma to address. Both therapists explained that respondent failed to benefit from treatment because she believed that she was not in need of trauma therapy. At the time of the termination hearing, there was no evidence that respondent had achieved the emotional and mental stability necessary to parent her children, especially children with special needs.

There was also compelling evidence that respondent would not be able to parent her children adequately within the foreseeable future. For more than two years, respondent had not shown that she could maintain forward progress. Throughout these proceedings, respondent's pattern was one of slight progress, immediately followed by regression. Respondent was not receptive to treatment. Considering respondent's lack of participation in addressing her children's medical and educational needs during the time the children were in care, and her

minimal participation in services, there was no reasonable expectation that respondent would be able to provide proper care for her children within a reasonable time.

Moreover, there existed clear and convincing evidence that the children would be harmed if returned to respondent's care. Respondent did not consistently attend to her children's needs, even with the benefit of the trial court's supervision and the availability of service providers. It is not a stretch to conclude that without the current level of supervision, respondent would simply abdicate her responsibility as a parent. This level of neglect, particularly for AC, could prove detrimental, indeed life-threatening, to the child. Consequently, there existed a reasonable likelihood that respondent's children would suffer serious harm if returned to her home.

In sum, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(j). Respondent was provided with an extensive treatment plan designed to improve her parenting skills and she was afforded more than 2½ years to remove the barriers to reunification. Indeed, she was allowed even more time after the trial court initially denied a petition to terminate her parental rights. Notwithstanding these efforts, respondent failed to comply substantially with her treatment plan. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id.* at 711. Accordingly, the trial court did not clearly err when it terminated respondent's parental rights under MCL 712A.19b(3)(j).

Because only one statutory ground need be established to terminate a respondent's parental rights, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), we need not consider whether the trial court properly terminated respondent's parental rights under MCL 712A.19b(3)(g).

## B. BEST-INTERESTS FACTORS

Next, respondent challenges the trial court's finding that termination of her parental rights was in the children's best interests. We find no error in this regard.

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. MCL 712A.19b(5); *In re Olive/Metts,* 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in the child's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013). We review for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App 126, 129; 777 NW2d 728 (2009).

A trial court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App at 41-42. The trial court may also consider psychological evaluations, the child's age, and a parent's history. *In re Jones,* 286

Mich App at 131. After considering the totality of the record, the trial court concluded that a preponderance of the evidence demonstrated that termination of respondent's parental rights was in the children's best interests. After reviewing the record, we are not left with a definite and firm conviction that a mistake has been made.

At the time of termination, JC and AC had been in care for more than two years and RN for a year. During this time, respondent was offered services, yet she was never able to sustain sufficient progress so as to demonstrate an improvement in her parenting skills. Indeed, respondent's nearly wholesale failure to become invested in her children's medical and educational concerns confirmed that respondent had not benefited from services and that the children would be at risk of harm in her care.

When balancing the best-interest factors, a court may consider the advantages of a foster home over the parent's home and the possibility of adoption. *In re White*, 303 Mich App at 713-714. All three of the children were thriving in their respective foster homes. Their needs were being satisfied. AC and JC's foster mother, their paternal aunt, went to extraordinary measures to ensure that their physical, medical, emotional, and educational needs were met. Similarly, RN, who was born prematurely, was bonded with her foster parent and well-cared for in the foster home. RN's foster mother ensured that RN received routine medical check-ups and appointments were scheduled and kept with specialists to rule out any issues associated with the child's premature birth. The paternal aunt expressed an interest in adopting AC and JC. She also knew of a family member who was willing to adopt RN. Thus, it is clearly apparent that the children were placed in stable homes where they were progressing and that this progress could continue because individuals existed who were willing and able to provide permanency for all three children.

Respondent argues that the trial court did not give appropriate weight to the fact that JC and AC were placed with a paternal relative. A "child's placement with relatives weighs against termination" and the fact that a child is living with a relative is an "explicit factor" that must be considered when determining whether termination is in the best interests of the child. *In re Olive/Metts*, 297 Mich App at 43. "A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id*. In this case, the record demonstrates that the trial court considered, but found unpersuasive, the fact that JC and AC were in relative placement. Instead, it found more compelling the fact that the children were in need of vigilant and attentive parents and that respondent was not committed, in any manner, to providing the level of care that her children required. Even though placement with a relative weighs against termination, and the fact that a child is living with relatives must be considered, a trial court may still terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *Id*. Considering this, the trial court did not clearly err when it determined that termination of respondent's parental rights was in AC's and JC's best interests, despite the fact that they were in relative placement with a paternal aunt.

Affirmed.

/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle